IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

MAR 0 9 2011

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

SANDRA J. COOK,

          Plaintiff,

v.

Civil Action No. 2:10CV91
(The Honorable John Preston Bailey)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "Commissioner"), denying the Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Sandra J. Cook ("Plaintiff"), filed her application for SSI benefits on December 5, 2006 (protective filing date November 7, 2006), alleging disability since November 5, 2006, due to back, knee, and hip pain (R. 138, 155). Her claim was denied initially and on reconsideration (R. 75-84). At Plaintiff's request, an administrative hearing was conducted by William H. Hauser, Administrative Law Judge ("ALJ"), on November 17, 2008, and at which Plaintiff; Beverly A.

Durboraw, a witness; and Lori Collin, a Vocational Expert ("VE"), testified (R. 21). The ALJ informed Plaintiff of her right to representation in writing and again at the hearing; however, Plaintiff elected to appear and testify at the hearing without representation. At the end of the hearing, the ALJ said there were very few medical records and he wanted to refer her for a consultative physical exam, after which, if necessary, he may hold a supplemental hearing. There is no evidence Plaintiff was ever referred for an examination. A different ALJ, Timothy Pace, held a supplemental hearing on September 29, 2009 (R. 51). Plaintiff again appeared unrepresented, despite having been advised in writing and in person that she had a right to representation. On October 22, 2009, ALJ Timothy Pace issued a decision finding that Plaintiff could perform a range of sedentary work and, therefore, was not disabled within the meaning of the Act (R. 19-20). On June 11, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1).

Because the undersigned United States Magistrate Judge cannot find substantial evidence supports the ALJ's decision in this matter, it is recommended this matter be reversed and remanded to the Commissioner for further proceedings.

## II. FACTS

Plaintiff was born on June 22, 1963, and was forty-five (45) years old on the date of the ALJ's decision (R. 28). She has a 9th grade education and did not obtain a GED (R. 28). She has no past relevant work, having worked essentially as a housewife most of her adult life (R. 31). She last worked at K-Mart in 2005, as a cashier for 45 minutes, after two or three days of training (R. 30). She testified she had to stop after the 45 minutes because the pain in her tailbone and hip and knees was too much. She told her supervisor she just couldn't do it, and was told to just go on home. Prior

to that she worked a few weeks at Wendy's in 2003 (R. 31).

On November 7, 2006, Plaintiff presented to Shenandoah Valley Medical Systems, seeing Physicians Assistant Violetta Gonzalez, for chief complaint of left knee pain (R. 211). Plaintiff reported her left knee pain began seven years earlier. The problem was aggravated by walking or standing. Her right knee was starting to hurt because she was favoring the left. She tried ibuprofen with no relief. On examination, Plaintiff was 5'4" tall and weighed 295 pounds (R. 211). Her right knee had tenderness and moderate pain with motion. Her left knee had tenderness and moderate pain with motion. There was a moderate decrease of range of motion in the left knee. Range of motion was normal in the right knee. There was no crepitus, edema or erythema noted in either knee.

X-Rays that date showed moderate osteoarthritis of the patellofemoral joint and mild osteoarthritis of the medial and lateral compartments in the left knee, and moderate osteoarthritis of the patellofemoral joint and minimal osteoarthritis of the lateral compartment.

Plaintiff applied for SSI disability on December 6, 2006, with a protective filing date of November 7, 2006. The Social Security employee who interviewed her noted Plaintiff walked with a slight limp and "when getting up from interview she got up slow and said her knee popped."

Plaintiff reported to the SS employee she had "no doctors really because she didn't have money and tried to deal with pain" (R. 140).

On Plaintiff's Disability Report filed that date, where asked how her conditions limited her ability to work, she responded:

> I can't walk very far, I can't stand like 20 min and it just feels like my left knee is as big as a balloon, it gets so tight, I can't sit for a period of time if I do when I get up my knee would pop, there is not a time that the pain is not in my knee, the arthrotec does help but does not take it away completely, if they would cut my legs off from top of my legs down it would probably feel better.

(R. 155). She also reported that her condition first interfered with her ability to work in 1996, but she became unable to work on November 5, 2006. Where asked why she stopped working, she responded:

> I did not work in past years because I was a stay at home mom, I went to Kmart for a few hours because we needed money but just could not do it.

(R. 155).

On December 6, 2006, Plaintiff completed a Function Report, reporting her daily activities as waking up her son for school; doing dishes if any; letting the dog out; watching television; making a sandwich for herself for lunch; fixing dinner (frozen dinners for the microwave with something little on the stove); watching television; and going to bed. She also played bingo at home with friends or family (R. 141). She took the dog for small walks and fed him. It took her ½ to one hour to prepare dinner. She did a little housecleaning. She had a friend who helped her mow grass or her husband did it. She took small walks– about 50 yards– every day (R. 144). She could drive and shop. She shopped about twice a week. She could pay bills, count change, handle a savings account, and use a checkbook. She had no problem getting along with others and described no changed in social activities since her conditions began. She believed she could walk 100 yards and would then need to rest about 10 to 15 minutes. She could pay attention and follow instructions very well. Her hobbies included watching tv, reading the newspaper, playing cards, playing bingo with friends or family, and talking to her sister long distance (R. 146). She went to church once a week and to her son's school events every few months. Plaintiff stated that the pain in her knees caused her to have poor sleep because they ached especially when turning over or even to stretch them out. She used a wheelchair when shopping for long periods of time.

In her Pain Questionnaire, completed that same date, Plaintiff reported her pain was in both

knees (R. 149). It was so bad she had trouble even checking the mail. There was not much that made it better. Cleaning house and house chores made it worse. Plaintiff was taking Arthrotec which sometimes relieved the pain.

On December 22, 2006, Plaintiff presented to Courtney Strothers, MD at Shenandoah, for complaint of rash for about 2 weeks (R. 232). She was assessed with dermatitis.

On February 28, 2007, a State reviewer, Christine Sias, completed a physical Residual Functional Capacity Assessment ("RFC"), opining that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift/carry 10 pounds; stand/walk at least two hours in an eight-hour workday; and sit about six hours in an eight-hour workday (R. 196). She could never climb ladders, ropes, or scaffolds, kneel, or crawl, and could only occasionally climb ramps or stairs, balance, stoop, and crouch. She should avoid even moderate exposure to extreme cold, all exposure to hazards, and concentrated exposure to extreme heat and vibration (R. 199). The reviewer reported that Plaintiff appeared mostly credible, and reduced her RFC to sedentary.

On March 6, 2007, Plaintiff presented to Shenandoah Valley Medical Systems, seeing Physicians Assistant Gonzalez for cold symptoms of 10 days duration and edema of the legs for the past few months. She said she had used "her mothers fluid pill for years and she has never gone to the doctor to check on that" (R. 209, 207). Her weight was 302 pounds. Examination showed edema of both lower legs, with pitting, with severity estimation as trace (R. 208). She was diagnosed with an ear infection and edema and prescribed Lasix for fluid reduction. X-rays of the knees were ordered.

On March 15, 2007, Ms. Gonzalez wrote a "To Whom it May Concern" letter, reporting that Plaintiff had been a patient for a few months and had mild to moderate osteoarthritis in both knees

(R. 206).

On March 28, 2007, Plaintiff presented to Ms. Gonzalez for follow-up of her edema and for a rash on her side and stomach (R. 203). She was assessed with edema of both lower legs, with pitting, severity estimated as trace; and dermatitis (R. 204).

On Plaintiff's Disability Report–Appeal, filed April 5, 2007, Plaintiff reported her pain had gotten worse and went up into her hip when she walked (R. 166). She was still taking Arthrotec and had been prescribed Lasix for fluid reduction. Since her last report, she now only cleaned her house once a week and only cooked one meal a month.

On April 27, 2007, State reviewing physician Cynthia Osborne, DO completed an RFC opining that Plaintiff could lift/carry 10 pounds occasionally and 10 pounds frequently; could stand/walk at least two hours in an eight-hour workday; and sit about six hours in an eight-hour workday (R. 214). She could never balance or climb ladders, ropes or scaffolds. She could occasionally perform all other posturals (R. 215). She should avoid concentrated exposure to extreme cold and hazards (R. 217). Dr. Osborne found Plaintiff's complaints credible and reduced her RFC to sedentary.

On her Disability Report– Appeal– filed date unknown, Plaintiff reported that since her last report, she now had pain in her ankles and hips while standing or walking, and noticed swelling in her legs and tail bone. She could not walk as far or do housework as before. She could not sleep and her hips began to hurt. She was still prescribed Arthrotec and Lasix but was now also taking prescription Ibuprofen and Tylenol.

On June 28, 2007, Plaintiff presented to Ms. Gonzalez for follow up of her knee pain and for sleeping issues (R. 237). Plaintiff reported her knee pain radiated to her hips. She said the Arthrotec

was not helping that much. Plaintiff also stated she had used her sister's medication to sleep. She believed it was clonazepam (Klonopin). She said she was "very stressed."

Upon examination, Plaintiff's knees both had tenderness and moderate pain with motion. She was obese. She had a depressed affect, and reported being anxious, feeling hopeless, and having mood swings. She was diagnosed with insomnia, depression and degenerative joint disease, and was prescribed Trazadone for sleep, and Lexapro.

On August 6, 2007, Plaintiff presented to Ms. Gonzalez for follow up of her anxiety and leg pain (R. 241). She said the effexor was not working, the lexapro seemed like it was working but not enough, and the Trazadone was helping her sleep. She had been taking Xanax "from her mother." She also complained of right leg pain for two weeks. Upon examination, Plaintiff had right hip tenderness, with moderate pain with motion. Left hip had full range of motion. Her affect was normal. She was diagnosed with joint pain of the pelvis.

On August 17, 2007, Plaintiff presented to the ER with complaints of a "vague feeling" that her throat was swollen, which she believed was due to an allergic reaction to prednisone given for her hip after she slipped in the tub two weeks earlier (R. 283). She said she had called her doctor wanting more pain medication, but her doctor declined to provide her with narcotic pain medication. Because of that and the reported feeling in her throat her doctor told her to go to the ER. Plaintiff had no difficulty breathing or swallowing, and had no swelling, she just had a "vague sensation that her throat is swollen." She reported her leg was somewhat improved, "she just wants better pain medicine and reports that she had had occasional spasms to the leg and wants a muscle relaxant."

Upon examination Plaintiff had pain with movement at the right hip. Her ambulation was mildly antalgic. Her throat was examined and was normal. The doctor wanted to do a urine sample

and x-rays, but Plaintiff "just stated that she really wanted pain medication for better control" and she would follow up with her own Primary Care Physician. The diagnosis was right hip pain. The doctor prescribed Percocet and Valium.

On August 21, 2007, Plaintiff presented to Ms. Gonzalez with complaints of having right leg pain after slipping in the tub and "pull[ing] something" (R. 243). Upon examination, Plaintiff had no lumbar spine tenderness and mobility and curvature were normal. Her left pelvis was nontender while the right had trochanteric tenderness. She was assessed with joint pain – pelvis. X-rays of the lumbar spine showed moderate degenerative disc disease, and degenerative facet disease at L5-S1 (R. 280). X-rays of the pelvis for right hip pain were normal, including the sacroiliac joints (R. 281). Dr. Gonzalez continued her on the diazepam as well as the other medications already prescribed.

On August 27, 2007, Plaintiff presented to the ER with complaints of back pain for approximately five weeks, since she slipped in the tub (R. 277). Upon examination, Plaintiff had no CVA tenderness and no pain on palpation of the lumbar area. Her abdomen was benign. Pain was reproducible when she rotated to the right as well as with leg raising, but it was unclear to the doctor if the hesitation to flex the right hip against passive resistance was because of pain or weakness. There was no atrophy noted. The diagnosis was right thigh and inguinal pain consistent with either back pain, radiculopathy or injury to the hip. The doctor prescribed several doses of Lortab, but advised she would have to follow up with her doctor for further treatment.

On August 27, 2007, Plaintiff presented to Ms. Gonzalez with complaints of groin pain, for which she said she had gone to the ER. X-rays showed nothing. Examination showed no joint deformity, heat, swelling, erythema or effusion of either hip, and full range of motion. Her pelvis

was non-tender. Ms. Gonzalez diagnosed muscle spasm of the right thigh.

On October 22, 2007, Plaintiff presented to Ms. Gonzalez for complaints of low back pain for the past three weeks, on a level of 7 out of 10 (R. 247). The pain radiated through her buttocks bilaterally. She said that Lortab alleviated the pain and Flexeril helped, but Arthrotec was not strong enough. She still had knee and lower leg pain. Her depression was at least 50% better. Examination showed posterior tenderness of the lumbar spine with moderately reduced range of motion. Both knees and hips had tenderness and moderate pain with motion. Ms. Gonzalez diagnosed chronic pain and depression under fair control. She informed Plaintiff she would need to sign a narcotic contract if she wanted to keep taking Lortab.

On March 19, 2008, Plaintiff presented to Dr. Ann DeLanoy at Shenandoah with complaints of weight gain, depression, and hip and knee pain (R. 249). She was "very tearful" about her weight gain. She said she did not eat that much. She did not believe the Lexapro was working for her depression. She said she had filed for disability, saying she was unable to work due to pain. She said she was not eating and took a sleeping pill on the weekends "because she has to get up at 5AM to get her husband to work" (R. 249). She stopped taking Arthrotec due to "GI symptoms" and that the pain was "overwhelming." Dr. DeLanoy examined Plaintiff's knees, noting she limped but used no assistive device. Neither knee had any effusion or atrophy. Both had tenderness. Tests for severe knee injury or torn meniscus were all negative.

Dr. DeLanoy diagnosed osteoarthritis, depression and obesity. She prescribed naproxen and increased Plaintiff's lexapro. Plaintiff refused any injection or orthopedic referral. Plaintiff also declined referral to Behavioral Health Services. The doctor recommended water aerobics, but Plaintiff said she was unable to afford it. She also declined referral to a dietician, exercise, or to

consider gastric bypass.

On April 6, 2008, Plaintiff presented to the ER for complaints of sore throat for the past eight days (R. 272). She was diagnosed with upper respiratory infection with possible sinusitis and prescribed an antibiotic and told to take ibuprofen.

Plaintiff presented to Dr. Anthony Owunna at Shenandoah on April 9, 2008 for cold symptoms (R. 252). She had gone to the ER twice. She complained of swollen glands, ear pain and laryngitis. Swelling was getting bigger with eating. Upon examination she appeared ill. She was assessed with laryngitis and told to rest and increase fluids and continue with regular medications.

On April 21, 2008, Plaintiff presented to the ER with complaints of abdominal pain, nausea and vomiting (R. 268). She had eaten eggs, steak and bacon at the Waffle House the evening before. On examination her abdomen was tender in the epigastric area. The doctor offered IV fluids and an antiemetic which she declined. She also declined to give a urine sample, and did not want any blood work done. She requested nausea medication, which was given to her, and then requested discharge. She was diagnosed with nausea and vomiting, diarrhea and abdominal cramping and discharged.

On July 4, 2008, Plaintiff presented to the ER with complaints of rectal bleeding (R. 265). She was diagnosed with rectal bleeding and referred for a colonoscopy. The colonoscopy revealed several polyps which were removed, and hemorrhoids, which were not at that time, but would be if she still had bleeding.

On November 13, 2008, Ms. Gonzalez wrote a "To Whom it May Concern" letter stating that she did not feel comfortable performing disability examinations due to the many measurements that must be performed (R. 228).

On November 16, 2008, Plaintiff presented to the ER with complaints of hip pain (R. 262).

10

She said she was prescribed ibuprofen but it was not managing the pain and she thought it was causing gastrointestinal bleeding. Upon examination she complained of tenderness in the right hip and sacroiliac joint. Straight leg raising caused reported pain at about 10 degrees bilaterally. She was diagnosed with right hip and buttock pain, suspicious for sciatica, and prescribed lortab and Flexeril.

Plaintiff's first Administrative Hearing was held on November 17, 2008, before ALJ Hauser, as scheduled (R. 21). After Plaintiff's testimony but before hearing the VE's testimony, ALJ Hauser stated:

> ALJ: Okay. Ma'am, you do not have a lot of medicals. I'm going to go over a physical examination for you so I have a better idea about your functions. I didn't get a lot of information from you about that and I think if I have a physical examination, it might be more telling. So before I make a decision, I'm going to have - - get the results of the physical exam and if I find it necessary to have a supplemental hearing after I review that exam, then I'll order it; otherwise, I may be able to make a decision after I have that - - after I have - - after I see that exam.
>
> Pl.: Okay.
>
> ALJ: I'm going to take the testimony of a vocational expert that I have here with me in the hearing office in Richmond in anticipation and try to anticipate what your residual functional capacity is. That's rather difficult because I don't have that exam before me and you don't have many medicals . . . .

(R. 40).

The ALJ then asked the Vocational Expert ("VE") a hypothetical, asking if any jobs would be available for an individual of Plaintiff's age, education and work experience, with osteoarthritis causing knee, hip, and low back pain (R. 43-44). The ALJ then gave the VE the limitations that the person could lift only 5 pounds frequently and 10 occasionally; sit 6 hours in an 8-hour workday and stand and walk 2 hours in an 8-hour workday; required a sit/stand option (stand 2 minutes in place

every hour); and with no crawling, kneeling, crouching, climbing ladders, balancing, and no heights. She could occasionally stoop (R. 44-45). The jobs would need to be sedentary and unskilled.

The VE testified in response that there would be jobs available for the hypothetical individual, such as charge account clerk (40,000 nationally/900 regionally); information clerk (110,000 nationally/3,000 regionally); and production inspector grader (41,000 nationally/500 regionally) (R. 45). If the individual were not able to meet time and attendance requirements or to be on site and attend to the task due to pain, there would be no jobs available (R. 46).

The ALJ did not ask the VE if her testimony was consistent with the DOT, nor did the VE herself state that it was.

At the conclusion of the hearing, the ALJ asked Plaintiff to submit any additional medical records she had, and said:

> Okay, you'll be given notice of where to go for this physical examination. Be sure to attend that. It'll be important that I get those records.

(R. 50). There is, however, no record of any physical examination subsequent to this hearing. Plaintiff, in her Complaint, states:

> I went in front of William Hauser for my hearing. He said he wanted me to see [a] Social Security Doctor to be evaluated for my disability. I was never contacted to see a doctor and later another judge denied my disability.

On December 11, 2008, Plaintiff presented to the Free Clinic for complaints of pain in the knees and hips not relieved with ultracet (R. 308). She asked for Boniva, as she said she was diagnosed with osteoporosis.[1] Upon examination she had pain with standing and walking. The diagnosis was osteoarthritis and bilateral knee and hip pain. She was prescribed Lasix, Ultram, and

---

[1]The undersigned could find no diagnosis of osteoporosis in the record.

Trazadone.

On December 17, 2008, Plaintiff presented to Dr. Dawn Jones at Shenandoah for back pain after falling on ice the day before (R. 255). Upon examination there was tenderness of the lumbar spine and moderate pain with motion. She was diagnosed with lumbar sprain and prescribed flexeril, ibuprofen and Lortab.

On January 8, 2009, Plaintiff presented to the Free Clinic for follow up of her obesity, arthritis, and depression, and for weight management (R. 310). She stated she only ate once a day. She was encouraged to start eating four small meals a day and to walk. Plaintiff responded that she could not walk far due to hip pain. She was diagnosed with depression, edema, and hip pain.

February 4, 2009, x-rays of the lumbar spine indicated disc narrowing on the left at L3-4 and narrowing of the disc at L5-S1, with small osteophytes diffusely (R. 304). The opinion was "degenerative changes."

X-rays of the knees that same date showed moderate narrowing of the left medial point compartment and probable narrowing of the patellofemoral compartment bilaterally with small patellar osteophytes bilaterally. No joint effusion was seen. The opinion was "osteoarthritis."

X-rays of the hips that same date showed small periarticular osteophytes bilaterally with no evidence of joint space narrowing. The opinion was "osteoarthritis" (R. 304).

On February 9, 2009, Plaintiff was granted a parking permit for mobility- impaired person by the State DMV (R. 305).

On February 14, 2009, Plaintiff presented to the ER with hip pain (R. 337). She had been seen on the 4th for the same problem and had x-rays done. She was taking ultracet with "no effect whatsoever," as well as lexapro and meloxicam. Examination showed significant pain on palpation

to the hip and any movement of that leg seemed to cause her pain. The doctor suggested injections, but Plaintiff rejected this suggestion as "she feels this is too invasive." She also considered surgery to be "too invasive." The doctor then discussed with her the use of narcotic pain medications in chronic pain and suggested against their regular use. He did feel, however, that she would benefit from "a short course of Lortab to help out with pain when it gets extreme." She was diagnosed with right-sided arthritic hip pain.

On March 4, 2009, Plaintiff presented to the ER with a sore throat (R. 334). She also advised of pain in her back and legs since she was a new patient there. She reported being diagnosed with severe osteoarthritis "for which she used to be on disability but now has been rejected from disability." She said she was not on chronic pain medications, but had been attempting to establish herself with a pain clinic as she had been having such discomfort. She was taking Advil, ibuprofen, and Lexapro. Examination of the back showed tenderness to palpation over the right SI joint–"Otherwise the remainder of her exam is within normal limits. Straight leg raise is within normal limits, plantar and dorsiflexes fine, ambulatory fine." She was diagnosed with pharyngitis and chronic back and leg pain secondary to osteoarthritis. She was prescribed Lortab for her throat as well as for her leg and back pain.

On March 7, 2009, three days later, Plaintiff presented to the ER with right groin and buttock pain initially noted when she was carrying grocery packages (R. 331). She denied any fall or trauma. She said she had not had pain quite like this before though she did note a history of osteoarthritis in her hips and knees. Upon examination her back was nontender to palpation. Legs were obese but nontender. Right knee was nontender and she tolerated range of motion without difficulty. There was pain with passive range of motion at the hip. There was no crepitus or gross deformity. X-ray

of the right hip showed mild degenerative changes but no evidence of fracture or dislocation (R. 319). X-ray of the pelvis for right groin pain was unremarkable (R. 320). She was diagnosed with right hip pain and morbid obesity and again prescribed Lortab.

An April 16, 2009, MRI of the right hip was unremarkable (R. 316).

On April 29, 2009, Plaintiff presented to the Free Clinic for follow-up (R. 315). She was diagnosed with depression and hip pain. She was prescribed Flexeril.

Plaintiff presented to the Free Clinic on July 10, 2009, for follow up (R. 313). Upon examination she had decreased range of motion of the right hip and difficulty with ambulation. She was diagnosed with right hip pain and prescribed prednisone and Daypro. She was also prescribed flexeril and ultracet.

On a Daily Activities Questionnaire completed on August 19, 2009, Plaintiff reported she did laundry and very little cooking and cleaning. She grocery shopped using a motorized buggy. Her husband and son carried the groceries. She visited family members once a week or so. She only cooked once in a while. She could make pancakes or an egg or two. She played cards. She did very little, but would maybe go to a fair when it came to town. She slept about 1 ½ hours per night, and took no naps during the day.

Plaintiff reported taking Daypro and Flexeril for arthritis, Lasix for fluid retention in her legs, and Trazadone for sleep (R. 190).

Plaintiff presented to the ER on August 20, 2009, for a complaint of right side pain (R. 329). She stated:

> Sunday [four days earlier] she was at the river while her brother was fishing. She went to go down the embankment however, slipped down on her right side, she estimates probably approximately 10 feet. Since then she has gradually had more

discomfort. She describes it as a right groin line and under her right buttock and does radiate down her leg to just below her knee.

Upon examination, Plaintiff had some lower lumbar tenderness with palpation, and was tender to palpation over the right buttock and hip area. She was able to lift her leg; however, this increased the discomfort more. She had good range of motion of the knee. A right hip x-ray showed moderate degenerative changes and no acute fracture (R. 321). A lumbar spine x-ray that same date showed multiple degenerative disease but no fracture or acute findings (R. 322). A pelvic x-ray that same date showed degenerative changes in both hip joints (R. 323). The doctor advised there was no sign of any bony injury and recommended a trial of pain medication and muscle relaxers. The diagnosis was contusion of the right hip and sciatica, right side. She was prescribed Lortab and Flexeril.

A second Administrative Hearing was held on September 29, 2009 (R. 53). As already noted, there is no record any physical examination was ever scheduled, and Plaintiff states she was never sent for an examination as ALJ Hauser had advised he would do. A different ALJ, Timothy Pace, presided over the second hearing. Plaintiff again appeared unrepresented, stating her counsel withdrew "because he said it was just going too long" (R. 53). She was asked if she wanted to represent herself and she responded that she did. There is no mention in the transcript of that hearing that it was a supplement to the original hearing in November 2008. ALJ Pace advised that he had medical records only dated through November 2008 (the time of the previous hearing) (R. 54).

ALJ Pace noted at the outset of the hearing that Plaintiff appeared a little bit uncomfortable seated, and advised she should feel free to stand at any time if she felt the need to do so (R. 55). A few questions later, he noted she appeared to be sitting a little bit uncomfortably and mentioned that

one doctor had opined she may have sciatica, but he had no MRI of her lower back in his records. Plaintiff stated she had had an MRI at City Hospital sometime that past spring. While true, this MRI was for her right hip, and the undersigned found no record of an MRI of the lower back.

Plaintiff testified she had never been prescribed any kind of brace or appliance or TENS unit. She did have a cane she used a few times a week mostly for going up or down steps. She was 5'4" and weighed 293 pounds. She was not on any weight loss program. She never received any injections and testified she had not been recommended surgery. She had not been to physical therapy or to pain management.

On a scale of 1-10, with 10 described as excruciating, Plaintiff described her day-in, day-out pain as a 9. She took prescription Ibuprofen, Ultracet, and Flexeril, but they did not relieve the pain. Plaintiff testified if sitting she would have to get up about every 25 minutes, and she would also lie down twice a day. She couldn't stand for more than five minutes or walk more than three minutes (R. 61). She used a motorized cart every time she went to the store. She could do laundry if she could sit; she could fix her own meals; she could wash dishes and do housework, but slowly. She could take a bath.

Plaintiff said she crocheted and played cards (R. 68). A couple times during the summer she went with her family to her brother's place on the river. She no longer fished, so she and her sister-in-law would play cards. She did not belong to a church or any social organizations.

The ALJ asked Plaintiff if she could do a job sitting and answering the phone and making people sign into a building, and she responded that she could. When he asked if she could do that for eight hours, she said: "No, if I got to sit all the time, I can't" (R. 63). He then asked her if she could do the job if she could get up about two or three times an hour, and she responded that she

could not, because she could not be getting up and sitting down (R. 64). She also elevated her leg during the day to decrease the fluid buildup in her legs. The ALJ then asked her if she was diabetic, or had congestive heart failure. When she replied that she did not believe so, he asked: "Does the doctor explain to you why you have fluid in your legs?" She replied, "No."

The ALJ then advised again that he had no medical records since November 2008, and asked Plaintiff to send any she had to him. He then stated:

> I don't have any follow-up records beyond November '08. From the symptoms that you describe and what you've told me from what you have that I don't have, there's evidence of degenerative disc disease which can account for the sciatic pain that you're experiencing down your leg. I don't know to what extent. I also don't know why you're taking Lasix. Why does the fluid build up in your body? I do have an examination that they conducted in November of last year showing a normal blood pressure reading. It did note that you were overweight and you were complaining of tenderness of the right hip at that time. The lungs were all right. The heart was regular pulse and rhythm, but they were concerned at that time about your right hip pain, suspicious for sciatica. I need to know to what extent that sciatica might interfere with your ability to sustain work activities. So it's essential for me to find those medical records, those - - I need some updates. And you're going to supply that to me?

The ALJ stated that "as [her] own advocate, [her] own representative," she had to secure the information for him (R. 71). He would keep the record open for two weeks, then take whatever information he had and close the record and review the exhibits in greater detail, and see if it directed him to a conclusion of disabled or not disabled.

ALJ Pace did not call a Vocational Expert. He did leave the record open and Plaintiff did submit the records she had since November 2008, which the undersigned has included above. ALJ Pace entered his decision on October 22, 2009. After his unfavorable decision, Plaintiff submitted her Request for Review of Hearing Decision to the Appeals Council, noting among others:

> The first Judge I saw and there was another lady with him after hearing all was said

18

she also said I wasn't able to do any kind of job[2] then the Judge said he was going to set up a examination with one of Social Security doctor's. I never got nothing about this. Then months later I got a letter to go see another Judge. There was no Doctor or anyone from Social Security on this matter from the first Judge I seen.

(R. 7-8) (sic).

## III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Pace made the following findings:

1.  The claimant has not engaged in substantial gainful activity since November 7, 2006 the application date (20 CFR 416.920(b) and 416.971 *et seq.*).

2.  The claimant has the following severe impairments: osteoarthritis of the knees, obesity, and degenerative disc disease of the lumbar spine (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she must be in a position that would allow her to stand in place for two minutes twice in every hour of sitting. She is limited to simple, unskilled, repetitive tasks in a stable work setting with very few changes. She cannot kneel or crawl.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on June 22, 1963, and was 43 years old, which is defined as a younger individual age 18- 44, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have

---

[2]The undersigned believes Plaintiff is referring to the Vocational Expert.

past relevant work (20 CFR 416.968).

9.        Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.      The claimant has not been under a disability, as defined in the Social Security Act, since November 7, 2006, the date the application was filed (R. 20 CFR 416.920(g).

(R. 13-20)

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Discussion

The Social Security Regulations set out a sequential five-step test the ALJ is to perform in

order to determine whether a claimant is disabled. See 20 C.F.R. section 404.1520. The ALJ must consider, in sequence, whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his or her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.

ALJ Pace followed the five steps of the sequential evaluation. The undersigned agrees with both ALJ's involved in this matter, that there is not a great deal of medical evidence to support Plaintiff's claims of disabling pain and limitations. The claimant bears the burden of production and proof during the first four steps of the inquiry. See Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992). If the claimant can carry her burden through the fourth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant can perform despite her condition. See id.

Although the claimant bears the burden of production and proof, it is well understood, at least in this Circuit, that the ALJ has an obligation to develop the record. The case law imposes on the ALJ a duty to develop the record, rather than rely on only the evidence submitted by the claimant, even if the claimant is represented. "[T]he ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986). The ALJ is permitted to develop the record in several ways, including questioning witnesses, requesting evidence, and subpoenaing witnesses. 20 C.F.R. sections 404.944, 404.950(d). Additionally, the ALJ may request the claimant, at the Social Security Administration's expense, to

obtain medical evidence. This includes arranging physical examinations of tests for the claimant if the claimant's own medical source cannot or will not provide sufficient medical evidence. 20 C.F.R. sections 416.914, 416.917.

It is fairly easy in this case for the undersigned to find the evidence submitted by Plaintiff was inadequate, because both ALJ's said it was. ALJ Hauser expressly stated he did not have enough information and he was going to send her for a physical examination to have a "better idea" about her functions. He also said, although he would take the VE's testimony, he would have to "try to anticipate" what Plaintiff's RFC was, which he called "rather difficult" because he did not yet have "that exam" before him. This was especially important because Plaintiff's long-time treating provider would not perform a disability examination "due to the many measurements that must be performed" (R. 228).

For whatever reason, the physical examination never took place. Plaintiff states that she waited to hear from ALJ Hauser regarding scheduling the examination, but never heard anything. Nor is there any indication in the record that a consultative examination had been offered or scheduled. By his own words, ALJ Hauser failed to fully develop the record. Substantial evidence therefore cannot support his RFC (which he himself admitted he would "try to anticipate") or his hypotheticals to the VE. Although not relevant to the case, the undersigned believes it was ALJ Hauser's intention to send Plaintiff for a consultative examination. He was never able to explain, however, because he did not hold the second hearing, and did not enter any decision in the matter.

Instead, Plaintiff received notice of a second hearing, without having had any consultative examination. At that hearing, ALJ Pace did not even mention that the hearing was supplemental, and did not mention the first hearing or a consultative examination. He did, however, note that he

had no medical records after November 2008 (which was when the first hearing was held). Again,

ALJ Pace himself states that there was a lack of evidence, stating:

> From the symptoms that you describe and what you've told me from what you have that I don't have, there's evidence of degenerative disc disease which can account for the sciatic pain that you're experiencing down your leg. I don't know to what extent. I also don't know why you're taking Lasix. Why does the fluid build up in your body? I do have an examination that they conducted in November of last year showing a normal blood pressure reading. It did note that you were overweight and you were complaining of tenderness of the right hip at that time. The lungs were all right. The heart was regular pulse and rhythm, but they were concerned at that time about your right hip pain, suspicious for sciatica. I need to know to what extent that sciatica might interfere with your ability to sustain work activities. So it's essential for me to find those medical records, those - - I need some updates. And you're going to supply that to me?

Plaintiff agreed to supply additional records from November 2008 on, but was mistaken about the

MRI. It was for her hip, not her back. There was no further evidence regarding why the one doctor

believed she had sciatica. Further, Plaintiff herself said she did not know why she retained fluid and

was prescribed Lasix, although the record does support that she had pitting edema of her legs and

was prescribed Lasix. There simply are no answers to ALJ Pace's questions in the evidence supplied

by Plaintiff.

The Commissioner has no duty to insist that a claimant have counsel. Marsh v. Harris, 632

F.2d 296 (4th Cir. 1980). The fact that Plaintiff was not represented by counsel is not in itself reason

to reverse the Commissioner's decision denying benefits. While lack of representation by counsel

is not by itself an indication that a hearing was not full and fair, however, the ALJ has a heightened

duty in cases involving unrepresented claimants, as in this case, to develop the factual record. The

Fourth Circuit has held that when a claimant is not represented, the ALJ is under a heightened duty

to ensure that all the facts of the case are fully explored, and that a failure on the part of the ALJ to

perform this duty may result in prejudice to the claimant, thus requiring the case to be remanded for further proceedings. Walker v. Harris, 642 F.2d 712 (4th Cir. 1981)(holding that the ALJ failed in her duty to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts in a case involving an unrepresented, poorly educated, pro se claimant).

The undersigned finds both ALJ's failed to fully develop the record in this case. For this reason alone, the case should be remanded to the Commissioner for further proceedings.

To complicate matters, ALJ Pace appears to have relied on ALJ Hauser's RFC (which was "anticipatory"), his hypothetical to the VE, and the VE's response to the hypotheticals. ALJ Pace did not hear the testimony of a VE at the second hearing. He found, however, that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform (R. 19). He did not cite the first VE's testimony or even mention the first hearing.

ALJ Pace found Plaintiff's ability to perform all or substantially all of the requirements of sedentary unskilled work was impeded by additional limitations, but then noted:

> Postural limitations or restrictions related to climbing ladders, ropes or scaffolds, balancing, kneeling, crouching or crawling would not usually erode the occupational base for a full range of sedentary unskilled work significantly because those activities are not usually required in sedentary work.

(citing Social Security Ruling 96-9p). This is a correct interpretation of the Ruling, and had those been Plaintiff's only limitations, there may have been no need for a VE. However, ALJ Pace did find Plaintiff had more than those postural limitations. He also found she would need to stand for two minutes twice every hour, and that she would need to be in a stable work setting with very few changes. SSR 96-9p provides that a need to alternate the required sitting of sedentary work by standing periodically, if the need cannot be accommodated by scheduled breaks, will erode the

occupational base for a full range of unskilled sedentary work. "It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work." The need for a stable work setting with very few changes is non-exertional in nature, and, according to SSR 96-9p, will also erode the unskilled sedentary occupational base. A substantial loss of the ability to deal with changes in a routine work setting "would justify a finding of disability," as this mental activity is generally required by competitive, remunerative, unskilled work. On the other hand, a less than substantial loss of ability to deal with changes in a routine work setting "may or may not significantly erode the unskilled sedentary occupational base . . . . When an individual has been found to have a limited ability in [this] basic work activit[y], it may be useful to consult a vocational resource." The Ruling identifies this limitation as nonexertional, and the undersigned so finds.

In Grant v. Schweiker, 699 F.2d 189 (4th Cir. 1983), the Fourth Circuit held:

Manifestly, if Grant demonstrates the presence of nonexertional impairments, the Secretary, in order to prevail, must be required to prove by expert vocational testimony that, despite Grant's combination of nonexertional and exertional impairments, specific jobs exist in the national economy which he can perform. The grids may satisfy the Secretary's burden of coming forward with evidence as to the availability of jobs the claimant can perform only where the claimant suffers solely from exertional impairments. To the extent that nonexertional impairments further limit the range of jobs available to the claimant, the grids may not be relied upon to demonstrate the availability of alternative work activities. Instead, in such cases the Secretary must produce a vocational expert to testify that the particular claimant retains the ability to perform specific jobs which exist in the national economy.

Plaintiff was found by both ALJ's to have both exertional and nonexertional impairments. Under Fourth Circuit law, therefore, a vocational expert was required to testify whether specific jobs existed in the national economy which she could perform. ALJ Pace did not call upon a Vocational Expert.

Insofar as ALJ Pace may have relied on the VE testimony from the first hearing, this reliance does not remedy the problem. ALJ Pace writes: "Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles" (R. 19). ALJ Hauser, however, did not ask the VE at his hearing if her testimony was consistent with the DOT. SSR 00-4p requires:

> At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

For this reason alone, ALJ Pace cannot rely on the VE's testimony in response to ALJ Hauser's hypothetical.

Finally, ALJ Pace finds that there are jobs that exist in significant numbers in the national economy that the claimant can perform. He does not, however, identify any actual jobs or the numbers of those jobs. Further, ALJ Hauser never entered a decision in the case, so he never found that the jobs named by the VE were jobs Plaintiff could perform or that they existed in significant numbers in the economy.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's determination that Plaintiff was not disabled at any time relevant to this decision.

## V. RECOMMENDED DECISION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for SSI. I accordingly recommend Defendant's Motion for Summary Judgment [D.E.19] be **DENIED**, and Plaintiff's Motion for Summary Judgment [D.E.14] be **GRANTED in part**, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record, and to Plaintiff, *pro se* by Certified United States Mail.

Respectfully submitted this __9__ day of March, 2011.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE